# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

**Dorothy Hand**

## DEFENDANTS

**Trumbull Insurance Company**

**(b)** County of Residence of First Listed Plaintiff  **Moore County, Texas**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  **Hartford County, CT**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Danny Ray Scott
Scott Law Offices, P.C.
708 Main Street
Houston, Texas 77002
(713) 941-9309

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
**28 U.S.C. §1332(a)(1)**

Brief description of cause:
**Plaintiff alleges breach of contract and statutory violations for denial of insurance claim.**

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
July 9, 2021

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

| | | |
|---|---|---|
| Dorothy Hand, | § | |
| | § | |
|     *Plaintiff,* | § | Civil Action No. 2:21-cv-135 |
| | § | |
| v. | § | |
| | § | |
| Trumbull Insurance Company, | § | |
| | § | |
|     *Defendant.* | § | |

## Plaintiff's Original Complaint

### A. Parties

1.    Plaintiff, Dorothy Hand, is an individual and a citizen of the State of Texas.

2.    Defendant, Trumbull Insurance Company, is a corporation that is incorporated under the laws of the State of Connecticut. Defendant has its principal place of business in the state of Connecticut. Defendant can be served with process by serving its agent for service of process, C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

### B. Jurisdiction

3.    The Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because plaintiff and defendant are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.

**C. Venue**

4.     Venue is proper in this district under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

**D. Conditions Precedent**

5.     All conditions precedent has been performed or have occurred.

**E. Facts**

6.     Plaintiff is the owner of homeowner insurance policy number 55RBF438914, which was issued by Trumbull (hereinafter referred to as the "policy").

7.     Plaintiff owns the insured property that is specifically located at 205 Powell Avenue, Dumas, Texas 79029 (hereinafter referred to as the "property").

8.     Defendant or its agent sold the policy insuring the property to plaintiff.

9.     On or about September 16, 2020, plaintiff's property sustained water damage. Plaintiff submitted a claim to Trumbull against the policy for the damage.

10.     Plaintiff submitted a claim to Trumbull against the policy for damage caused to the property because of the water.  The insured asked Trumbull to cover the cost of repairs to the property pursuant to the policy and any other available coverages under the policy.  Trumbull assigned claim number Y86 DP 68548 to the insured's claim.

11.     On or about November 25, 2020, Bruce DeSmet ("DeSmet") inspected the property in question.  DeSmet performed an insufficient and unreasonable interior investigation of the property.  Water intrusion into the property's interior caused

extensive damage to the walls, insulation, flooring, and ceilings of the bedrooms, utility room, kitchen, dining room, den, foyer, hallways, bathrooms, living room, and sub rooms. The extensive damage to the interior of the property called for flooring to be replaced, drywalls to be sealed, hung, taped, and floated, removal and replacement of insulation, repair to the texture, painting, and content removal. DeSmet did not conduct a thorough interior inspection and did not make sufficient allowances for interior damages. As a result of Desmet's unreasonable investigation, the insureds were wrongly denied the full cost to repair all the interior damage.

12. In addition, DeSmet performed an insufficient and unreasonable investigation of the home's foundation. The water damaged the property's foundation by allowing water to accumulate beneath the home. In addition to causing damage to the piers, the water caused the soil underneath the home to shift and to destabilize the foundation. As a result of Desmet's unreasonable investigation, the insureds were wrongly denied the full cost to repair the damage to the home's foundation.

13. Trumbull failed to properly adjust the claim and Trumbull has denied at least a portion of the claim without an adequate investigation, even though the policy provided coverage for losses such as those suffered by the insured. Furthermore, Trumbull underpaid portions of the insured's claims by not providing full coverage for the damages sustained by the insured, as well as under-scoping the damages during its investigation.

14.    To date, Trumbull continues to delay in the payment for the damages to the property.  As such, the insured's claim(s) remain unpaid, and the insured still has not been able to properly repair the property.

### F. THE CASUALTY INSURANCE SYSTEM

15.    The casualty insurance industry is one in which policyholders are forced to buy an unseen, but socially essential, financial product "on faith" from insurers who market their product with promises of prompt and full protection.  The indemnity principle of insurance expresses the casualty insurer's traditional duty to provide full restitution of covered casualty losses in order to preserve its insureds' standard of living.  Under the fiduciary principle, "an insurance company holds funds of its insureds (the payment of premiums) in trust, and through an 'insuring agreement' promises to make *all benefit payments for which it has received premiums.*"

### THE ROLE OF INSURANCE UNDERWRITING

16.    Underwriting is the process of (1) deciding which accounts are acceptable, (2) determining the premiums to be charged and the terms and conditions of the insurance contract, and (3) monitoring those decisions.  Underwriting is what insurers do to be financially successful.  Although insurers include other specialty departments such as actuarial, claims, and marketing, all insurer activities follow from corporate underwriting decisions.  The purpose of underwriting is to ensure that the risk transfer is equitable, and the insurer is able to develop and maintain a growing, profitable book of business.

17.     The law of large numbers helps insurers to predict the number of losses they will pay in any given time period so that they can determine what premium is required to pay those losses.  The law of large numbers enables insurers to offer large dollar amounts of coverage for much less money in return.  Insurers underwrite a large number of similar risks and predict the dollar amount of all the losses that those insureds are expected to experience.  Premiums are based on each insured's share of the predicted losses plus the insurer's expenses and an allowance for profit.

18.     Insurance can work effectively only if underwriters accept risks that will experience no more than the types and amounts of losses anticipated in the rates.  If underwriters accept risks that experience more losses than anticipated, then the rates will be inadequate, and the insurer's solvency might be threatened.  Actuaries predict the number of losses that will occur and the amount of money that insurers will pay in claims to develop rates for insurance.  The claim department provides the raw data, such as number of claims, claim payments, and reserve amounts, that actuaries analyze through complex mathematical methods.  Actuaries use this actual claims data in predicting the number of losses that will occur and the amount of money that insurers will pay in claims. Insurers then use this information to set premium rates that will enable the insurers to pay the predicted amount of policyholder claims, pay the insurers' expenses, and make a reasonable profit/surplus.  Insurance companies could not provide this valuable service unless they were able to make a legitimate profit sufficient to allow them to remain

solvent and provide a reasonable return to their shareholders/stakeholders. Premiums are already calculated to allow insurers to accomplish both of those goals.

19. Casualty insurance is designed to pay the full cost of the property casualty losses suffered in a covered event. Under the indemnity principle, the "objective [of casualty insurance] is to restore the insured to the same financial position after the loss that he or she was in prior to the loss." When casualty insurance works properly, it achieves this socially vital objective – and our lives can proceed relatively unimpaired by the financial hardship of an unexpected casualty loss. When casualty insurance fails and leaves us in a worse financial position after a covered loss, the indemnity principle is defeated, and we all suffer the consequences.

**HOW INSURANCE PREMIUMS ARE CALCULATED**

20. The primary building block of casualty premiums is called "loss costs." Loss costs are the insurer's good faith projection of how much it will pay for legitimate claims during a given policy period. Loss costs are based on vast actuarial experience and are usually very accurate, being based on the "law of large numbers." Loss costs make up generally about seventy cents ($0.70) of every premium dollar we pay for property-casualty coverages.

21. Insurers charge their policyholders about seventy cents ($0.70) out of every premium dollar to pay all the claims that will arise during the policy period. Expenses and overhead account for an additional twenty-five cents ($0.25) of each premium dollar,

with the remaining five cents ($0.05) being allocated for the insurer's profit.  In addition, the insurer's profits include not only the final five cents ($0.05) of the premium dollar but also the investment value on the entire premium dollar during the time between when the premiums are collected and when the claims are finally paid (on average about ten cents ($0.10) per dollar) making the real profit about fifteen cents ($0.15) for each premium dollar.

22.    The seventy cents ($0.70) of the policy dollar represents the part of the premium fund designated to pay policyholder claims.  If the insurer's promise to pay claims is the product we are buying, then the insurer's projection of loss costs is like that statement on the product label describing important details of the product to the customer. Policyholders do not want to pay for more losses than the insurer is going to pay – just as consumers do not want to pay for more of a product than they are going to receive from their purchase.

23.    Policyholders expect insurers to design their "claim payment factory" to generate a product that meets the expectations created by the promises the insurers make on the label of every product it sells, i.e., … the insurance policy.  Policyholders' most important expectations are full indemnification and peace of mind – the security of knowing covered casualty losses will be restored promptly and fairly, without being forced through a lot of needless adversarial hoops.  Policyholders do not expect the insurance product to be designed so that only experts, attorneys and insurance

professionals can figure out how to obtain its promised benefits.  Rather, policyholders expect to be able to receive the benefits of their insurance policies themselves without a lot of difficulty and delay and without professional help.

THE ROLE OF THE CLAIMS ADJUSTER

24.    Claims are handled well when insurance companies pay what they owe, promptly and without muss or fuss.  When claims departments become transformed into profit centers and the job of claims adjuster is redesigned to be a contributor to corporate profits, however, how claims departments work affects how well they work.  With a new, systematic approach to the claims process, claims departments work well for the companies but sometimes not so well for those who rely on them.

25.    As late as the 1970's, most insurance adjusters exercised a great deal of discretion.  The adjuster saw his job as settling claims for a fair amount.  The common understanding was "we close the case out with everybody happy" by paying "what the claim is worth."  Insurance companies were not in business to "chisel" the public.  If the insurance company knew the claim was worth $20,000, then the insurance company paid $20,000.

26.    The claims adjuster whose job demands brains, integrity, and guts is now much less in evidence, because most adjusters are more closely bound to office and computer and are subject to elaborate systems that direct their work.  Today's adjuster is less an advocate for fair treatment of the consumer, because adjusters are often required to conform to the demands of the claim-processing system and are evaluated on their

conformity to the system, including, explicitly or implicitly, on the amount paid out, or not paid out, in claims. The key to the claim process is the system, not the adjuster. A highly organized, industrialized system for processing claims is the key to modern insurance adjusting. The model is the shift from individual craftsman as jack-of-all-trades to specialized production in which each worker in a factory produces a single product, over and over. Because the adjuster has less discretion, he needs less training, and the training that is provided is focused on applying the system. More than a third of insurance companies provide new adjusters with two to four weeks of training, and one out of eight companies provide less than a week of training or no training at all. The knowledge that is needed for processing claims is built into the system and therefore does not have to be held by the adjuster. Adjusters have become less independent and more efficient from the company's point of view, with efficiency defined in terms of following the dictates of the claims systems. The systems dictate process and results, and adjusters are evaluated on their adherence to the system. The adjuster's new role, therefore, is less to be an experienced professional making an individual evaluation of each claim and more a clerk executing the demands of the system. From the company's and the adjuster's perspective, this makes each claim much like every other claim, which generates efficient and predictable results. From the policyholder's perspective, of course, that is not the point of the insurance policy; the point of the insurance policy is prompt and fair processing of a unique loss.

27.    The most widely information system in property casualty insurance adjusting is Xactimate®, which estimates the cost of repairs to damaged homes and other property. Xactimate® is software for estimating the extent of a loss and the cost of repairs that presumes to be exact.  A property loss adjuster takes his Xactimate®-loaded laptop and measures, records and lists information about the damaged property, and the program produces a dollar amount that will be the basis of the insurance company's payment of a claim.  Xactimate® works off choices made by the adjuster, and because it needs to cover many different situations, the program is designed to give the adjuster a wide range of choices.  Each of these choices affects the repair estimate.  When drywall is replaced, the new drywall needs to be painted; the adjuster must choose the appropriate application – seal/prime, seal then paint, paint one coat, or paint two coats – each of which will produce a different cost estimate.  If a large area of drywall needs to be replaced, the adjuster may or may not decide the furniture and other contents need to be removed to allow for work space and to protect the contents; that can be accounted for as labor and contents manipulation, with the adjuster adding a variable for the time needed or the size of the room as small, medium, or large.  In the case at hand, the defendant manipulated Xactimate® in a manner that led to the improper denial of all or part of the claim at issue in this lawsuit.

28.    If Xactimate® was exact, it would benefit insurance companies and policyholders alike.  Unfortunately, Xactimate® permits considerable error by adjusters

and each is subject to manipulation by insurance companies. Xactimate® is a tool and, like any other tool, it is neither perfect nor impervious to misuse. It first depends on an accurate scope of the work and, as with any program, the concept of "garbage in, garbage out" applies. Any errors in scope will produce an inaccurate estimate. Like other elements of the systematic approach to claims processing, Xactimate® might favor efficiency and profits at the expense of accuracy and fairness. In the case at hand, the defendant's adjusters committed considerable error in their use of Xactimate® and manipulated Xactimate® in a manner that led to the improper denial of all or part of the claim at issue in this lawsuit.

29. The adjuster's job is to honor the company's promise to pay what is owed, no more but no less. Whether and how much an adjuster pays in a particular case or all cases should depend only on how much the company owes on claims. If the adjuster's pay, or the adjuster's status as a third-party vendor, is tied to reducing claim payouts or on closing cases without payment, then the insurance company has given the adjuster an incentive to violate accepted practices and break the promise the company made to its policyholders. In the case at hand, the defendant provided positive and/or negative incentives to its adjusters that caused defendant's adjusters to adjust the claim in a manner that led to the improper denial of all or part of the claim at issue in this lawsuit.

30. When a policyholder files a claim, the fundamental truth about the claim process should come into play: when a loss occurs that is within the coverage of the insurance

policy, the policyholder has already paid for the loss. The risk has been defined, priced, transferred from the insured to the insurance company, and shared by the company among its policyholders and investors, so all that is legitimately left to be done is to pay the claim. From the policyholder's point of view, the covered event should now be risk free – that is, free of the risk that the company will fail to pay what it owes. The actuary's job is to evaluate risk characteristics, the underwriter's job is to evaluate potential insureds, and the executive's job is to manage the whole process, but the claims adjuster's only job is to decide if a loss falls within the policy, determine the extent of the loss, and pay the claim. In the case at hand, the policyholders of which Trumbull's book of business was comprised paid the full value of plaintiff's loss. However, Trumbull intentionally and strategically failed to transfer those claim trust funds to plaintiff and instead retained those funds as profit. Trumbull's wrongful actions led to the improper denial of plaintiff's claim.

INSURANCE COMPANIES' USE OF LITIGATION

31.    "When an insured buys insurance, she buys insurance – not a lot of vexatious, time-consuming, expensive litigation with her insurer." As stated previously, insurance companies account for future claim payouts, claim expenses, and a reasonable profit in setting premium rates for their books of business. However, insurance companies have hired consulting companies, such as McKinsey & Company, to implement plans, strategies, policies, and processes to transform insurance companies' claim departments

into profit centers.  McKinsey & Company is the most powerful consulting company in the world and has "the greatest global reach of any advisor to management in the world." It serves as the chief advisor and key architect of strategic thinking for "147 of the world's 200 largest corporations, including 80 of the top 120 financial-services firms, 9 of the 11 largest chemical companies, and 15 of the 22 biggest health-care and pharmaceutical concerns."  McKinsey's clients pay from $10 million to $60 million per year for advice on how to manage their business operations to increase profitability.  McKinsey & Company acted as a leader in formulating a new insurance strategy to convert insurance claim departments into efficient profit centers.  Many of the world's largest insurers hired McKinsey for this purpose.  However, although every insurance company did not hire McKinsey directly and did not have a direct relationship with McKinsey, McKinsey's policies influenced the operations of the insurance industry as a whole because of the extraordinary results McKinsey achieved for the insurance companies that did retain McKinsey directly for its consulting services.  By 1992, McKinsey had already worked on a number of projects for insurance companies seeking to increase profits.  These included State Farm, Hartford, United Services Automobile Association (USAA), Nationwide, and Liberty Mutual as well.  During the mid-1980's, USAA invited interested members of the insurance community to its home office in San Antonio for open discussions about McKinsey's redesign of its claim system.  USAA credited McKinsey with "saving" the

company and openly shared information about McKinsey's creation of USAA's new claims handling system.

32.     In essence, the McKinsey strategy calls for insurance companies to take measures to reach various goals as part of its design to convert the insurance claims handling department into an efficient profit center. A major goal of this strategy is to shift any advantage away from the insureds and plaintiffs' attorneys. As the first step in the process, insurers reduce attorney representation levels by improving the initial customer service experience for its insureds. Specifically, insurers make early contact with the insureds following a claim, promises fair treatment, and promises prompt payment. During the claim investigation, insurers aggressively investigate only the facts which defeat the claim once attorney representation begins. Insurers then make "firm" [take-it-or-leave-it] settlement offers with no real negotiation. If the insured refuses to accept the "firm" offer, then the insurance company aggressively litigates the claim to verdict without negotiation or compromise, employing hard-nosed tactics designed to make litigation so lengthy and expensive that policyholders and attorneys will yield to the insurer's claim values. Essentially, policyholders who want "prompt" payment – meaning they are willing to give the insurance company a cut from their share of the claim trust fund – get "Good Hands" treatment; while policyholders who want "fair" payment – meaning they refuse to give the insurance company a cut from their share of

the claim trust fund – get "Boxing Gloves" treatment. No policyholder, however, would get both prompt *and* fair payment of a claim.

33. McKinsey implemented a litigation management system designed to enforce policyholder acceptance of its new claim system. Under traditional casualty insurance thinking, insurers were naturally disposed to avoiding litigation whenever possible, because litigation tended to defeat the goals of the fiduciary/indemnity paradigm. McKinsey saw litigation as providing the best possible venue for achieving the goals of its new system for casualty insurance. Litigation is costly and time consuming. It allows an insurer to fully exploit its overwhelming financial superiority and the policyholder's vulnerability to delay, which is the natural consequence of the casualty loss. Litigation would also provide a means for McKinsey to send messages to other policyholders and plaintiff's attorneys about the futility of resistance to the new system.

34. In addition to these company-level procedures, McKinsey implemented an insurance company strategy that focused on societal, legislative, and commercial measures which all but ensured the success of the strategy. McKinsey implemented a plan for insurance companies to lead national campaigns to attempt to change public policy, abolish or reduce the effectiveness of bad faith statutes, and judicially repeal the common law fiduciary/indemnity paradigm which made it bad faith for casualty insurers to use increased shareholder value or increased claim surpluses as the only legitimate goals of claim handling.

35. Defendant's claim handling protocols, company goals, profit goals and claim handling strategy originates from the doctrine that was created, implemented, and shared with the insurance community by McKinsey. Defendant's protocols, strategies, and procedures for handling homeowner insurance claims are closely aligned with and virtually matches the claims handling system created by McKinsey. In the case at hand, Trumbull implemented a McKinsey based claim handling system to increase its profits at plaintiff's expense.

### G. INFORMATION LIKELY TO BE IN THE POSSESSION OF TRUMBULL

36. As with all bad faith cases, most of the proof of plaintiff's bad faith claim against Trumbull will be uniquely and solely in Trumbull's possession. Therefore, because the facts pled in this complaint are peculiarly within the defendant's knowledge, the facts contained in plaintiff's amended complaint are based on plaintiff's available information and belief. FED. R. CIV. P. 9(b). Such allegations have evidentiary support arising out of the facts of this case, and the plaintiff believes such allegations will have further evidentiary support after a reasonable opportunity for further discovery from Trumbull.

37. Trumbull's parent corporation, The Hartford, initiated a program in the mid-1990's created by consulting conglomerate McKinsey & Company. The purpose of the the McKinsey claims handling program was nothing less than to transform Trumbull into the most profitable claim service in the industry. Hartford's McKinsey program achieved this goal by artificially reducing claim payments. Hartford's McKinsey program was the

result of a closed file survey conducted by Hartford personnel rather than independent auditors. These closed file surveys purported to identify which claims were overpaid. The closed file survey included a flaw as it did not utilize an established metric for the underpayment of claims. The true motive behind the closed file survey was to identify ways to artificially lower claim payouts in a manner detrimental to Trumbull's first- and third-party claimants. In the case at hand, Trumbull employed Hartford's McKinsey program principles to its handling of plaintiff's claim in a manner that maximized shareholder profits and compromised the fair handling of plaintiff's claim.

38.     Trumbull ensured its employees would assist in the implementation of Hartford's McKinsey program by creating incentive programs for claim adjusters and management to reduce average claim payouts, regardless of merit. These artificial goals had, and continue to have, no rational relationship to the actual value of any individual claim, including the plaintiff's claim in this case.

39.     One of the ways in which Trumbull achieved lowered claim payments was to adopt an aggressive strategy towards property claims. Following property claims, Trumbull implements a policy of standard denial, which requires insurance adjusters to initially deny policyholder claims as a means of gauging the policyholder's willingness to haggle with the insurance company. If the policyholder accepts the denial, then Trumbull retains all the money owed to the policyholder. In essence, Trumbull eliminates claims by issuing sweeping denials under the presumption that some

policyholders will accept the denial without question. Policyholders who refuse to accept the denial and choose to pursue their claim through litigation, however, Hartford's McKinsey program's "mad dog defense tactics" that frustrate policyholders' ability to pursue their claims. In addition, because litigating insurance bad faith claims has become so expensive and time consuming, policyholders and attorneys are becoming increasingly unwilling to fight insurance companies. Thus, Trumbull not only frustrates policyholders' attempts to pursue their claim, but Trumbull also sends a message to plaintiff's attorneys that filing suit against Trumbull does not constitute an economically viable option. As a result, lawyers who routinely represent plaintiffs in first-party insurance homeowner insurance claims will refuse to represent plaintiffs who have claims against Trumbull.

40. Trumbull also routinely withholds "overhead and profit" as part of its scheme to achieve lowered claim payments. "Overhead and profit" is a benefit available to policyholders that provides an additional twenty percent above the amount of the claim to pay for a general contractor to coordinate repairs. Insurance companies have an obligation to include overhead and profit in the actual cash value payment. Trumbull conceals and fails to disclose the availability of the overhead and profit benefit to policyholders. In this case, Trumbull wrongfully denied coverage for plaintiff's claim for overhead and profit.

41.     Trumbull also creates an environment that encourages independent adjusters to underpay claims.  By tracking the average amount paid on claims for each adjuster, Trumbull can determine which adjusters are keeping costs down.  Trumbull therefore rewards independent adjusters by giving them additional business in exchange for minimizing Trumbull's indemnity payout on claims.  This arrangement creates a conflict of interest between the independent adjusters and the policyholders and allows the policyholders to detrimentally rely on the independent adjusters' determinations without knowledge of the conflict of interest.  In this case, Trumbull assigned an inadequately trained adjuster to inspect plaintiff's property and adjust plaintiff's claim.  In addition, the adjuster had a Trumbull-provided financial incentive to deny all or part of plaintiff's claim.

42.     Through implementation of Hartford's McKinsey program, Trumbull develops incentives, such as promotions for keeping costs down, that results in policyholders being paid less than they are owed.  Hartford's McKinsey program creates pressure for profit-making that manifests itself in underpayment of claims.  Trumbull had actual awareness that Hartford's McKinsey program would result in underpaying policyholders' claims.  Trumbull employs a nationwide scheme to cheat policyholders out of money to which the policyholders are entitled.  Trumbull has employed the principles and techniques of Hartford's McKinsey program against plaintiff in this case in a deceptive, fraudulent, oppressive, and malicious manner.  In this case, Trumbull provided its managers,

adjusters and employees who handled plaintiff's claim with a financial incentive to deny all or part of plaintiff's claim.

43.  Another component of Hartford's McKinsey program focused on the rate at which claimants were represented by legal counsel. Trumbull's Hartford's McKinsey program manual directed claim representatives to "realize that the way we approach claimants and develop relationships will significantly alter representation rates and contribute to lower severities." The manual explained that "when an attorney represents a claimant, we pay 2-3 more times to settle the claim." Consequently, Trumbull instructed its claim personnel to eliminate or reduce the likelihood that a claimant would hire an attorney.

44.  By dissuading claimants from seeking legal counsel, Trumbull was able to prey upon unrepresented claimants' trust and lack of knowledge and to deny or settle claims for a fraction of their value. If a settlement offer was not accepted or the claimant hired an attorney, Trumbull would fully litigate virtually every claim, irrespective of the value of the injuries suffered by the claimant. Trumbull thereby sought to subject claimants to unnecessary and oppressive litigation and expenses, or in other words, "scorched-earth litigation tactics." In the case at hand, Trumbull wrongfully denied all or a portion of plaintiff's claim with the expectation that plaintiff would not hire an attorney.

45.  According to the Hartford's McKinsey program manual, certain categories of claims rarely reached trial, "because on a case-by-case basis, a settlement [could] be

justified when litigation costs were considered."  Consequently, Trumbull instructed its claim representatives to meet with the claimants' attorneys to emphasize those costs" *i.e.*, "attorney economics" – through threats, intimidation, and strong-arm tactics.  Trumbull carried out its policies through the active participation of its attorneys.  The "Litigation Management" section of the Hartford's McKinsey program manual segmented, or targeted, certain claims for litigation and trial.  One such litigation segment was referred to as "Settle for 'X' or less – default to trial."  Trumbull's attorneys were required to "increase trial activity in appropriate cases," such as "where settlement could not be reached for the evaluated amount."  The reason that Trumbull's attorneys were expected to have "more trials" was to "reduce loss payout."  Trumbull used incentive compensation programs to encourage its attorneys to try more cases, irrespective of whether such litigation was justified by the facts.  In the case at hand, Trumbull denied plaintiff's claim as part of its scheme to use litigation costs and "attorney economics" to dissuade plaintiff and any attorney plaintiff would hire from challenging Trumbull's claim decision.

46.    Any resulting decrease in claim payments did not serve as a reflection of the true value of the defended claims.  Trumbull's research indicated that claimants' attorneys who brought cases to trial obtained favorable results.   Nevertheless, because of Trumbull's scorched-earth litigation tactics and the message Trumbull sends to attorneys regarding Trumbull's proactive claim defense stance, Trumbull correctly predicted that

substantially fewer claimant attorneys would bring those insureds' claims to trial. Hence, Trumbull would receive a net decrease in claim payouts.

47. Trumbull applied the claim handling principles of Hartford's McKinsey program across all insurance coverage lines. Specifically, Trumbull specifically implemented Homeowner Hartford's McKinsey program to govern its handling of homeowner fire, wind, and hail insurance claims.

48. Trumbull handled plaintiffs' claim under the construct, policies, procedures, and goals of the Hartford's claims handling program created by McKinsey & Company and implemented by Trumbull.

### H. TRUMBULL'S CLOSED FILE SURVEY

49. Prior to Trumbull's implementation of Hartford's McKinsey program, McKinsey & Company conducted a preliminary "Closed File Survey" of its claims offices and file reviews. Before initiating the survey, McKinsey began with the presumption that Trumbull's claim process exhibited "leakage," or the overpayment of policyholder claims. It is worth noting that the McKinsey slides provide no proof or support for this critical assumption. Subsequently, Trumbull's senior executives became somewhat uncomfortable with McKinsey's term "leakage," and began to substitute the oxymoronic phrase "fair value" or "fair payment."

50. McKinsey then segmented homeowner claims into homogenous groups based on type of coverage, type of damage, and attorney involvement. Using this segmentation

procedure to organize the claim processes that would make up Hartford's McKinsey program, McKinsey classified claims into groups based on common characteristics, which presented the best opportunity for reducing claim payments. McKinsey determined that the evaluation of roofs damaged by wind and hail and presented the largest opportunity for reduced claim payouts. McKinsey's closed file survey indicated that "overpayments" occurred in the adjustment of wind and hail roof damage claims when adjusters evaluated claims based on their professional claim experience according to the individual merits of each claim.

51. While building Hartford's McKinsey program, Trumbull and McKinsey started with profit goals and then built a claim evaluation system aimed at achieving those goals. Specifically, McKinsey built Trumbull's claim evaluation system around Colossus. Colossus allowed Trumbull to calibrate or "tune" the software program by inputting predetermined claim values which Trumbull's adjusters could incorporate into their actual claim evaluations. In other words, Trumbull would predetermine the value of certain claims and then charge its adjusters with matching those values in their actual claim evaluations. In determining the preset values, Trumbull used figures that aligned with its profit goals rather than using evaluations from independent, real world professionals. Rather than using real and current market values in its "tuning" of Colossus, Trumbull entered its own figures and used those evaluations to set a "new and reduced market value for claims." Trumbull used Colossus in its Hartford's McKinsey

program evaluation of bodily injury claims. However, when applying Hartford's McKinsey program to homeowner claims, Trumbull accomplished its Hartford's McKinsey program objectives through its use of ACCUPRO and Xactimate. It is the market's role – not Trumbull's role - to set market values for claims, and Trumbull committed bad faith in attempting to artificially set claim market values and apply those values to plaintiffs' claim.

52. The McKinsey documents are the construction plans for Trumbull's "claim payment factory." They show how McKinsey designed Trumbull's claim handling system to underpay homeowner and other insurance claims. They show how McKinsey designed Trumbull's claim factory to produce an inherently defective product that fails to provide insureds with prompt and fair indemnification for their covered losses, thereby endangering our standard of living. Trumbull evaluated the plaintiffs' claim using this system and denied the plaintiffs' claim for reasons unrelated to the merits of the claim.

53. Trumbull knew that its implementation of Hartford's McKinsey program would create a significant risk of liability for bad faith claims and punitive damages. Nevertheless, Trumbull analyzed Hartford's McKinsey program for "balance of risk and reward" and concluded that Hartford's McKinsey program's rewards would justify any risk. In other words, even if Courts and juries imposed bad faith penalties on the minimal number of cases that proceeded to trial, Hartford's McKinsey program would still

produce the intended profits because plaintiffs' lawyers would overall be reluctant to litigate and take enough cases to trial. Remember, Trumbull devoted a substantial portion of Hartford's McKinsey program to sending a message to plaintiffs' attorneys regarding "attorney economics" and the fact that Trumbull would vigorously defend claims without regard to the merits of those claims.

54. The goals, processes, and procedures of the Hartford's McKinsey program have been absorbed into Trumbull's overall way of doing business. While Trumbull might no longer use the Hartford's McKinsey program's terminology, the concepts, and teachings of Hartford's McKinsey program in using the claims handling department as a profit center remain in effect. Trumbull never stopped using Hartford's McKinsey program in its handling of insurance claims. Trumbull never hired McKinsey or another consulting firm to take on the monumental task of teaching a different claims handling system to its employees, instilling a new claim handling culture, or ensuring the elimination of Hartford's McKinsey program from Trumbull's claim handling culture, goals, and procedures. The goals, processes, and procedures left over from the Hartford's McKinsey program have been used to deny the plaintiff's claim in a deceptive, fraudulent, oppressive, and malicious manner. In the case at hand, Trumbull employed its McKinsey-based claim system in its handling of plaintiff's claim. In doing so, Trumbull denied or underpaid plaintiff's claim as part of a strategy and scheme to guarantee or increase its surplus and shareholder returns. To date, Trumbull continues to delay in the

payment for the damages to the property.  As such, the plaintiff's claim remains unpaid, and the plaintiff was never able to properly repair the property.

## I. POST-CLAIM UNDERWRITING

55.    Plaintiff alleges that Trumbull engaged in fraudulent post-claim underwriting. At the time that defendant sold the insurance policy to plaintiff, defendant had no intention of performing its duties and honoring the representations it made to plaintiff. Specially, this representation consisted of defendant's promise to provide full indemnity to plaintiff from financial loss caused by a covered peril, less the policy deductible. Trumbull intentionally under-evaluated the risk associated with the insurance policy to secure the policy sale and made an attempt to properly evaluate the risk only after plaintiff filed the insurance claim at issue.    In its use of post-claim underwriting, defendant searched for reasons to deny plaintiff's claim by conducting the type of evaluation that it should have conducted before defendant sold the policy to plaintiff and before plaintiff paid insurance premiums to defendant.   Had plaintiff known and understood that defendant would engage in post-claim underwriting before plaintiff agreed to purchase the insurance policy from defendant, the plaintiff could have made an informed decision and purchased coverage from a different insurance company. Defendant's actions allowed defendant to collect an upfront premium profit while intending to betray its promise of full indemnity.   In the case at hand, defendant's

fraudulent post-claim underwriting scheme caused plaintiff to purchase a worthless insurance policy and suffer financial property loss.

56.    Trumbull denied or underpaid plaintiff's claim as part of a strategy and scheme to guarantee or increase its surplus and shareholder returns.  To date, Trumbull continues to delay in the payment for the damages to the property.  As such, the plaintiff's claim remains unpaid, and the plaintiff was never able to properly repair the property.

### J. Count 1 - Bad Faith

57.    Plaintiff is insured under an insurance contract issued by Trumbull, which gave rise to a duty of good faith and fair dealing.

58.    Defendant breached the duty by denying and delaying payment of a covered claim when defendant knew or should have known its liability under the policy was reasonably clear.

59.    Following its initial inspection conducted on September 28, 2017, Trumbull possessed all information necessary to enable it to make a fair coverage and payment determination on plaintiff's claim.   In addition, following its initial inspection, Trumbull failed to provide coverage for all the covered damage, including the damage that plaintiff's inspector discovered during his inspection.  Although Trumbull designed its claims investigation system in a manner that would ensure timely claim payments, reasonable property inspections, and thorough property inspections, Trumbull failed to

honor its obligation to perform a reasonable investigation and issue timely payment to plaintiff.

60.   Defendant's breach of duty proximately caused injury to plaintiff, which resulted in the following damages:

> a.   mental anguish damages; and

> b.   loss of policy benefits.

61.   <u>Exemplary damages.</u>  Plaintiff suffered injury independent of the loss of policy benefits, and that injury resulted from defendant's gross negligence, malice, or actual fraud, which entitles plaintiff to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

## K. COUNT 2 - BREACH OF CONTRACT

62.   In addition to other counts, Trumbull breached its contract with plaintiff.

63.   Plaintiff and defendant executed a valid and enforceable insurance contract.  The contract stated that defendant would pay the replacement cost of all damage which occurred to plaintiff's property caused by a covered peril, and that plaintiff would pay insurance premiums and perform other obligations as outlined in the insurance policy.

64.   Plaintiff fully performed plaintiff's contractual obligations.

65.   Trumbull breached the contract by refusing to pay the full amount of the cost to repair or replace the property.  Trumbull failed and refused to pay any of the proceeds of the policy, although due demand was made for proceeds to be paid in an amount

sufficient to cover the damaged property and all conditions precedent to recovery upon the policy had been carried out and accomplished by plaintiff.

66.   Plaintiff seeks unliquidated damages within the jurisdictional limits of this court.

67.   <u>Attorney Fees.</u>  Plaintiff is entitled to recover reasonable attorney fees under Texas Civil Practice & Remedies Code chapter 38 because this suit is for breach of a written contract.  Plaintiff retained counsel, who presented plaintiff's claim to Trumbull.  Trumbull did not tender the amount owed within 30 days of when the claim was presented.

## L. COUNT 3 – DECEPTIVE INSURANCE PRACTICES

68.   Defendant Trumbull failed to explain to plaintiff the reasons for Trumbull's offer of an inadequate settlement.  Trumbull failed to offer plaintiff adequate compensation without adequate explanation of the basis in the policy for its decision to make less than full payment.  Furthermore, Trumbull did not communicate that any future settlements or payments would be forthcoming to pay for the entire losses covered under the policy, nor did they provide any explanation for the failure to adequately settle plaintiff's claim.

69.   Trumbull failed to affirm or deny coverage of plaintiff's claim within a reasonable time.  Specifically, plaintiff did not receive timely indication of acceptance or rejection, regarding the full and entire claim, in writing from Trumbull.

70.   Trumbull refused to fully compensate plaintiff under the terms of the policy, even though Trumbull failed to conduct a reasonable investigation.  Trumbull performed

an outcome-oriented investigation of the plaintiff's claim which resulted in a biased, unfair, and inadequate evaluation of plaintiff's losses on the property.

71.     Trumbull failed to meet its obligations under the Texas Insurance Code regarding its duties to timely acknowledge plaintiff's claim, begin an investigation of plaintiff's claim, and request all information reasonably necessary to investigate plaintiff's claim within the statutorily mandated time of receiving notice of plaintiff's claim.

72.     Trumbull failed to accept or deny plaintiff's full and entire claim within the statutorily mandated time of receiving all necessary information.   In addition, Trumbull failed to communicate with plaintiff to ensure that plaintiff understood the coverage denials they received.

73.     Defendants' acts or practices violated:

a.     Texas Insurance Code chapter 541, subchapter B.

(1)     Misrepresenting to a claimant a material fact or policy provision relating to the coverage at issue.  TEX. INS. CODE §541.060(a)(1).

(2)     Not attempting in good faith to bring about a prompt, fair, and equitable settlement of a claim once the insurer's liability becomes reasonably clear.  TEX. INS. CODE §541.060(a)(2)(A).

(3)     Not promptly giving a policyholder a reasonable explanation, based on the policy as it relates to the facts or applicable law, for the insurer's denial of

a claim or for the offer of a compromise settlement of a claim. Tex. Ins. Code §541.060(a)(3).

(4)     Not affirming or denying coverage within a reasonable time. Tex. Ins. Code §541.060(a)(4)(A).

(5)     Refusing to pay a claim without conducting a reasonable investigation. Tex. Ins. Code §541.060(a)(7).

(6)     Making an untrue statement of material fact. Tex. Ins. Code §541.061(1).

(7)     Leaving out a material fact, so that other statements are rendered misleading. Tex. Ins. Code §541.061(2).

b.     Texas Deceptive Trade Practices Act §17.46(b).

(1)     Representing that an agreement confers or involves rights, remedies, or obligations that it does not, or that are prohibited by law. Tex. Bus. & Com. Code §17.46(b)(12).

c.     Texas Insurance Code Chapter 541.151.

74.    Defendants' acts and practices were a producing cause of injury to plaintiff which resulted in the following damages:

a.     actual damages; and

b.     insurance policy proceeds.

75.    Plaintiff seeks damages within the jurisdictional limits of this Court.

76.   <u>Additional damages.</u>  Defendants acted knowingly, which entitles plaintiff to recover treble damages under Texas Insurance Code section 541.152(b).

77.   <u>Attorney fees.</u>  Plaintiff is entitled to recover reasonable and necessary attorney fees under Texas Insurance Code section 541.152(a)(1).

## M. Count 4 - Late Payment of Claims

78.   Plaintiff is insured under a contract for homeowner's insurance issued by defendant.

79.   Defendant Trumbull is a corporation.

80.   Plaintiff suffered a loss covered by the policy and gave proper notice to Trumbull of plaintiff's claim.

81.   Trumbull is liable for the claim and had a duty to pay the claim in a timely manner.

82.   Defendant breached its duty to pay plaintiff's claim in a timely manner by not timely:

   a.   acknowledging the claim;

   b.   investigating the claim;

   c.   requesting information about the claim;

   d.   paying the claim after wrongfully rejecting it; and

   e.   paying the claim after accepting it.

83. Trumbull's breach of duty caused injury to plaintiff, which resulted in the following damages:

    a.    mental anguish damages;

    b.    policy proceeds;

    c.    prejudgment interest

84. <u>Statutory damages.</u> Plaintiff is entitled to recover actual damages in the amount of the claim, and under Texas Insurance Code section 542.060(a), statutory damages of 18% of the amount of the claim.

85. <u>Attorney fees.</u> Plaintiff is entitled to recover reasonable attorney fees under Texas Insurance Code section 542.060(b).

## N. COUNT 5 - NEGLIGENCE

86. An insurance policy is a financial product that, when designed properly, serves its intended function of indemnifying insurance consumers against financial loss. Rather than designing the financial product in a manner that would indemnify plaintiff against loss, defendant designed the financial product in a manner that would increase defendant's profits while exposing plaintiff to an unreasonable risk of financial harm. Specifically, the financial product that defendant sold to plaintiff was designed to place an unreasonable risk of financial loss on the plaintiff by requiring plaintiff to pay for covered damages with plaintiff's own funds rather than ensuring that the defendant indemnify plaintiff for those damages. Defendant made departures from the proper

design of the financial product so that defendant could increase its profits. That departure exposed plaintiff to an unreasonable risk of financial harm. That risk was realized, and plaintiff suffered financial harm as a result.

87. Defendant owed plaintiff a legal duty to design the financial product in a manner that would provide indemnity against financial loss caused by a peril that is covered by the insurance policy. By designing the financial produce in a matter that would place an unreasonable risk of financial loss on the plaintiff so that defendant could increase its profits, the defendant breached that duty. This breach proximately caused the plaintiff's damages in that plaintiff still has not been indemnified for her damages and plaintiff still bears the full burden of the risk that came to fruition on the date of loss.

88. Defendant's breach has caused plaintiff to suffer economic loss. Plaintiff seeks actual damages, exemplary damages, costs, and prejudgment and postjudgment interest from defendant.

## O. JURY DEMAND

89. Plaintiff respectfully requests a trial by jury.

## P. CONDITIONS PRECEDENT

90. All conditions precedent to plaintiff's claim for relief have been performed or have occurred.

## Q. Prayer

91. For these reasons, plaintiff asks that plaintiff be awarded a judgment against defendant for the following:

    a.    Actual damages.

    b.    Prejudgment and postjudgment interest.

    c.    Consequential damages.

    d.    Court costs.

    e.    Attorneys' fees.

    f.    Exemplary damages.

    g.    All other relief to which plaintiff is entitled.

Respectfully submitted,

SCOTT LAW OFFICES, P.C.
The Great Jones Building
708 Main Street
Houston, Texas 77002
Telephone: (713) 941-9309
Facsimile: (844) 270-0740


*/s/Danny Ray Scott*
_____
Danny Ray Scott
State Bar No. 24010920
casenotifications@scottlawyers.com

*Attorney for Plaintiff*